Joseph **WRIGHT**, Appellant-Defendant,

v.

**STATE of Indiana**, Appellee-Plaintiff.

No. 4–881A102.

Court of Appeals of Indiana, Fourth District.

June 10, 1982.

George M. Fisher, Crown Point, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

CONOVER, Judge.

## STATEMENT OF THE CASE

Joseph Wright was charged with murder in Lake Superior Court. Trial was held before a jury and Wright was found guilty of the lesser included offense of voluntary manslaughter and sentenced to ten years imprisonment. Wright's appointed trial counsel filed a motion to correct errors which was overruled. Another attorney was appointed to perfect an appeal to this court. Permission was granted to file a belated motion to correct errors. Wright now appeals the overruling of the belated motion to correct errors.

We affirm.

## ISSUES

1. Is the current "mockery of justice" standard for review of convictions alleging denial of effective assistance of counsel unconstitutional?

2. Does the method of selecting public defenders in Lake County, Indiana deprive defendants of the effective assistance of counsel?

3. Did the actions of Wright's attorney at trial deprive him of effective assistance of counsel under the "mockery of justice" standard?

## FACTS

Joseph Wright, the defendant/appellant, left his apartment on April 2, 1980, with his brother James Wright to visit bars in Gary, Indiana. James drove Joseph to two different bars in a car owned by Joseph. Joseph has been blind for over 10 years and is unable to drive. At the second bar Robert

Scales approached the Wright vehicle and initiated a conversation with Joseph. The conversation between Scales and Joseph Wright grew into a heated argument. At that point Joseph ordered James to leave the car and Scales took the driver's seat. The men then departed in Joseph's car.

Early on the morning of April 3, James received a call from Joseph asking him to come to the apartment. When James arrived he found Robert Scales lying outside the apartment, beneath a second floor window. Joseph told his brother that he had killed Scales because Scales was a homosexual and wanted to have sex with him. James refused to help Joseph dispose of the body but did take a bloodstained tire iron to the car. James returned to the room and assisted Joseph in removing bloodstained sheets from the bed. The brothers departed in the car and threw the sheets out a few blocks away.

Willie Wright, another brother of James and Joseph, lived in a room down the hall from Joseph. When he awoke at 3:00 to 3:30 a. m. on April 3 he could hear noise in the hallway. When he investigated he saw that the window at the end of the hall was open and the plastic covering the window was ripped and blood splattered. Willie looked outside the window and saw a man lying on the concrete below. A trail of blood led from the window to Joseph's room. Willie related the situation to the landlord who called the police.

When the police arrived they found the body lying in a pool of blood with lacerations on the forehead and a smashed jaw. In Joseph's room police found blood on the floor and walls and a large pool of blood on the mattress. The coroner took samples of blood from the body, identified as Robert Scales, and from the blood in the room. These blood samples were consistent with blood taken by swabbing from the arms of Joseph Wright and blood on a lug wrench found in the Wright car. After autopsy the cause of death of Robert Scales was determined to be intracranial hemorrhaging and laceration of the brain caused by a beating of the outside of the head.

## DISCUSSION AND DECISION MOCKERY OF JUSTICE STANDARD

Wright attempts to persuade us to declare unconstitutional the current Indiana standard of reviewing claims of inadequate assistance of counsel. The current rule is expressed as follows:

"There is a presumption that counsel has discharged his duty fully, and it requires strong and convincing evidence to rebut this presumption of adequacy. In order to prevail, a defendant must show that his representation was so inadequate as to reduce the trial, taken as a whole, to a mockery of justice." (Citations omitted.)

*Rahim v. State*, (1981) Ind., 417 N.E.2d 343, 345.

The only authority cited by Wright to support his argument are a series of Supreme Court cases discussing the sixth amendment right to effective assistance of counsel.[1] None of those cases have imposed a fixed standard upon the states to use when assessing the competency of trial counsel.

■ The Indiana Supreme Court and the Fourth District Court of Appeals have recently reaffirmed the "mockery of justice" test. *Adams v. State*, (1982) Ind., 430 N.E.2d 771; *Weaver v. State*, (1982) Ind., 432 N.E.2d 5; *Shull v. State*, (1981) Ind. App., 421 N.E.2d 1. Stare decisis prevails, mandating affirmance of the trial court's adherence to the "mockery of justice" standard.

## PUBLIC DEFENDER SELECTION

Wright's second argument challenges the public defender selection system in Lake County. In his opinion the pauper attor-

---

1. *Holloway v. Arkansas*, (1978) 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426; *Tollett v. Henderson*, (1972) 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235; *Anders v. California*, (1967) 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493; *Gideon v. Wainwright*, (1963) 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

neys are subject to outside pressure and cannot function as independent advocates.

Public defenders of the Criminal Division, Lake Superior Court are assigned to specific courtrooms in the division and "are hired by and serve at the pleasure and behest of the judges of that division." Each public defender is subject to the rules and regulations of the judge presiding in that room. Other employees serve under different terms of employment, either fixed term or employment contract, and may only be discharged for cause by majority vote or by a presiding judge, after a hearing, for insubordination. Wright contends the pauper attorney system in Lake County precludes a truly independent public defender corps. In his view, the knowledge that the public defender must serve two masters prohibits an independent and zealous defense.

Wright offers two bases for holding the Lake County system unconstitutional. The first is that the American Bar Association, legal commentators, commissions and organizations have proposed standards that would limit judicial interference in the public defender's representation of indigents. Although the recommendations of these committees are commendable goals for the judicial system, they have no binding effect. States are still free to adopt methods of providing legal assistance tailored to the extant circumstances. No constitutional infirmity is indicated by Wright's argument. To the contrary, the attorney has a specific status in relation to his client that is unaffected by the source of his remuneration.[2]

The only delimiting rule imposed on the public defender system by the sixth amendment is that the State respect the independence of the public defender. In *Polk County v. Dodson*, (1981) — U.S. ——, ——, 102 S.Ct. 445, 451, 70 L.Ed.2d 509, the Supreme Court said:

**2.** "Once a lawyer has undertaken the representation of an accused, the duties and obligations are the same whether the lawyer is privately retained, appointed, or serving in a legal aid or defender program." American Bar Association Standards for Criminal Justice, 4–3.9 (2d ed. 1980).

"Second, and equally important, it is the constitutional obligation of the State to respect the professional independence of the public defenders whom it engages. This Court's decision in *Gideon v. Wainwright*, 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799] (1963), established the right of State criminal defendants to the "guiding hand of counsel at every step in the proceedings against [them]." *Id.*, at 345 [83 S.Ct. at 797], *quoting Powell v. Alabama*, 287 U.S. 45, 69 [53 S.Ct. 55, 64, 77 L.Ed. 158] (1932). Implicit in the concept of a "guiding hand" is the assumption that counsel will be free of State control. There can be no fair trial unless the accused receives the services of an effective and independent advocate. See, *e.g., Gideon v. Wainwright, supra; Holloway v. Arkansas*, 435 U.S. 475 [98 S.Ct. 1173, 55 L.Ed.2d 426] (1978). At least in the absence of pleading and proof to the contrary, we therefore cannot assume that Polk County, having employed public defenders to satisfy the State's obligations under *Gideon v. Wainwright*, has attempted to control their action in a manner inconsistent with the principles on which *Gideon* rests."

*Id.*, 102 S.Ct. at 451.

■ Although *Polk County* was brought under 42 U.S.C. 1983, that analysis is germane to the present inquiry.[3] Wright has made only a minimal showing of possible prejudice resulting from the pauper attorney system of Lake County. Absent a positive showing of prejudice we cannot hold the Lake County public defender appointment procedures violative of the sixth amendment.

Wright also contends that judicial supervision of pauper attorneys violates the Canons of Ethics and is therefore unconstitutional. Specifically, he argues violations of EC 5–21, EC 5–22 and Canon 9. EC 5–21 is as follows:

**3.** A similar claim, based on the sixth amendment, was rejected in *Polk County* for failure to cite any constitutionally egregious policy. *Polk County, supra* 102 S.Ct. at 454.

"EC 5–21 The obligation of a lawyer to exercise professional judgment solely on behalf of his client requires that he disregard the desires of others that might impair his free judgment. The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer. These influences are often subtle, and a lawyer must be alert to their existence. A lawyer subjected to outside pressures should make full disclosure of them to his client; and if he or his client believes that the effectiveness of his representation has been or will be impaired thereby, the lawyer should take proper steps to withdraw from representation of his client."

EC–5–22 states:

"EC 5–22 Economic, political, or social pressures by third persons are less likely to impinge upon the independent judgment of a lawyer in a matter in which he is compensated directly by his client and his professional work is exclusively with his client. On the other hand, if a lawyer is compensated from a source other than his client, he may feel a sense of responsibility to someone other than his client."

Canon 9 states:

"A lawyer should avoid even the appearance of impropriety."

Wright argues that a system which contravenes these ethical precepts is tantamount to a violation of the sixth amendment. In support of that proposition Wright cites *Anders v. California*, (1967) 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493, where the Supreme Court discussed the California practice permitting a pauper attorney to withdraw from an appeal after submitting a "no-merit" letter to the court. In that case, the defendant's pauper attorney was permitted to withdraw and a request to appoint new counsel was denied. The Supreme Court said,

"The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as opposed to that of *amicus curi-*

*ae.* The no-merit letter and the procedure it triggers do not reach that dignity. Counsel should, and can with honor and without conflict, be of more assistance to his client and to the court. His role as advocate requires that he support his client's appeal to the best of his ability."

*Id.* at 744, 87 S.Ct. at 1400. Wright concludes the pauper attorneys of Lake County are subject to such pressure from the court they serve that they function as *amici* rather than advocates, violating the code of ethics and the sixth amendment.

This argument misapprehends the purpose of the Canons and the Ethical Considerations. The Preliminary Statement to the Code of Ethics states:

"The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession. They embody the general concepts from which the Ethical Considerations and the Disciplinary Rules are derived.

The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations.

The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character."

The Canons and EC's do not represent minimum standards of conduct expected of the attorney. Thus, a system that does not fully comport with the Canons and EC's is not *per se* violative of the defendant's rights. The Indiana Supreme Court has recognized the advisory nature of the Canons and EC's.

"We therefore conclude that the Disciplinary Rules, and not the Ethical Considerations, prescribe the conduct which constitutes a violation of the Code of Professional Responsibility. Reference to the Ethical Considerations as aspirational objectives indicates that they are not com-

pulsory in character. Rather they express high ideals towards which attorneys are urged to strive. But attorneys are not compelled to achieve these aspirational goals at the risk of a disciplinary sanction or civil liability."

*Kizer v. Davis*, (1977) Ind.App., 369 N.E.2d 439, 444.

When the Disciplinary Rules are consulted they provide clear direction to an attorney in the employ of a third party. DR 5–107(B) provides:

"(B) A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services."

Code of Professional Responsibility DR 5–107(B). This Disciplinary Rule affirmatively obligates the pauper attorney to resist outside pressure that might affect his professional judgment. We agree with Chief Justice Burger's analysis of DR 5–107(B):

"The advocate, as an officer of the court which issued the commission to practice, owes an obligation to the court to repudiate any external effort to direct how the obligations to the client are to be carried out. The obligations owed by the attorney to the client are defined by the professional codes, not by the governmental entity from which the defense advocate's compensation is derived."

*Polk County, supra*, 102 S.Ct. at 454 (Burger, C. J., concurring).

The Code of Professional Responsibility clearly directs the attorney to resist outside pressure that could impinge upon effective representation of his client. Absent proof that pressure was exerted, either implicitly or explicitly, upon the pauper attorneys of Lake County, we can only hold that the indigent defendants of Lake County are insured of "the guiding hand of counsel at every stage of the proceedings." *Gideon v. Wainwright*, (1963) 372 U.S. 335, 345, 83 S.Ct. 792, 797, 9 L.Ed.2d 799.

The Code of Judicial Conduct has similar provisions governing the treatment of persons with whom the judge has official contact. Canon 3 A provides in part:

"(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding."

■ It is clear from these citations that the judiciary has a mandate to treat all officers of the court with equal courtesy and deference. We cannot presume the judges of the Lake Superior Court have acted otherwise. Although judicial supervision of appointed counsel may appear to give the opportunity for subtle pressure to be exerted; the ethical precepts incumbent upon the principals prescribe judicial neutrality and advocatorial partiality as the norm of legal behavior. We can thus find no constitutional error in the delivery of legal services to indigent defendants in Lake County, Indiana.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ This argument addresses adequacy of counsel's performance in behalf of Wright. Wright has waived this issue for the purpose of appeal. Appellant's brief merely recites the standard of review and directs the court's attention to the errors presented in the belated motion to correct errors with, "the unusual request that this Court read the entire transcript."

■ Cases interpreting Ind.Rules of Procedure, Appellate Rule 8.3(A)(7) require appellants to present cogent argument and citation to relevant authority to preserve the issues. *Weekley v. State*, (1981) Ind. App., 415 N.E.2d 152. Bald assertions of

error preserve nothing for appeal. *Tapp v. State*, (1980) Ind.App., 406 N.E.2d 296. Mere reference to errors cited in the motion to correct errors does not comply with the spirit or letter of A.R. 8.3(A)(7). Wright has thus waived his objections. Having determined that Wright was not denied the effective assistance of counsel, the verdict of the trial court is accordingly affirmed.

MILLER, P. J., and BUCHANAN, C. J. (sitting by designation), concur.